OPINION OF THE COURT
Kristin Booth Glen, J.
This motion and cross motion raise an important practical *987 question for the way in which attorneys’ fee disputes are determined in matrimonial actions. Put most simply, the question is whether an Individual Assignment System (IAS) matrimonial Judge has the power to request or require time records[1] (or some approximation thereof),[2] from the opposing side in an application for counsel fees by a nontitled spouse. For the reasons discussed below the answer is affirmative.
THE IMPORTANCE OF FEE DETERMINATIONS
How counsel fees are awarded in matrimonial cases is important, not only to the parties and their attorneys, but as a policy matter for the court system itself. The court’s interest is at least twofold: saving scarce judicial and nonjudicial resources by avoiding unnecessary hearings, and insuring that nontitled spouses, generally wives, are not unfairly disadvantaged because of their inability to obtain adequate representation. This latter concern at least indirectly implicates another judicial interest — the commitment of our court system to the eradication of gender bias.

Problems of Delay

Under present law the party opposing an award of counsel fees, at least after a trial, is entitled to a hearing on the appropriateness of the fees sought. (See, e.g., Petritis v Petritis, 131 AD2d 651, 654 [2d Dept 1987], citing Price v Price, 115 AD2d 530 [2d Dept 1985]; Sadofsky v Sadofsky, 78 AD2d 520 [2d Dept 1980].) The attorney who seeks fees is not entitled to include the fees necessitated by the application, including any hearing, and so may be required to expend thousands or even tens of thousands in uncompensated dollars before an award is actually made. (See, e.g., Schussler v Schussler, 123 AD2d 618 [2d Dept 1986].) The attorney for the titled spouse faces no *988 such difficulty.[3] Further, as a practical matter, fee hearings generally take place months or even a year or more after conclusion of the trial. Payment to the nontitled spouse’s attorney is thus even further delayed. This delay may also have serious consequences for the parties.[4]

Potential Gender Bias

Numerous commentators have observed and described the difficulties faced by a nontitled, often not gainfully employed spouse in obtaining counsel and in financing matrimonial litigation. The possibility of gender-biased discrimination in this process has been noted by, e.g., the Task Force on Gender in the Courts (see, 1986 Report of NY Task Force on Women in Cts, at 103-106).
Despite the existence of Domestic Relations Law § 237 and its provision for interim fees, both Judges and practitioners know that in most cases a matrimonial lawyer taking on representation of a nontitled spouse with limited or no resources is buying an "account receivable” which may be discounted, collected late, or never collected at all.[5] The disincentive for engaging in such representation is great, and nontitled spouses frequently find it almost impossible to obtain counsel without a very substantial retainer. The situation is even further exacerbated where the titled spouse has made it known that the case will be vigorously litigated. The potential consequences for the nontitled spouse are obvious and well known.[6]
*989 Where experience shows that counsel for a nontitled spouse may have to wait as much as five years before being paid, as the instant case demonstrates, few attorneys will take on such representation, thus increasing the possibility of an impermissible discriminatory outcome. Conversely, shortening the time in which counsel for the nontitled spouse can be certain of securing her fair fee thus serves both that spouse and the court system’s interest in the impartial, nondiscriminatory administration of justice.

Burdens on the Court and Referees

Finally, as the facts in this case demonstrate, fee hearings tax an already overburdened court system while disadvantaging the Referees who, of necessity,[7] generally preside over them.[8]
Even the use of the Referees’ good offices may not remove the Judge from the process,[9] placing her in a somewhat peculiar legal position,[10] and further increasing court time expended and delay for all parties.[11]

*990
Alternatives to Hearing

For all these reasons, fee hearings should be discouraged so long as there is some fair alternative way to determine fees. The Trial Judge’s ability to ascertain the amount of time spent by the titled spouse’s counsel may frequently be the key to this process.
For example, at the conclusion of trial, and before any hearing is held, the attorney for the nontitled spouse may submit an affirmation of services. If the hours spent by that attorney are substantially fewer than the hours spent by the attorney for the titled spouse, the latter may be persuaded that no hearing is necessary, that the fees sought are fair, and s/he may either agree to a determination on papers or settlement. By the same token, if the hours claimed by the nontitled spouse’s attorney are substantially in excess of those claimed by the titled spouse’s attorney, s/he may reduce her/ his demand or the Judge may be able to work out a settlement in lieu of hearing.
Although the system’s general concern should be to avoid the necessity for hearing, the availability of opposing counsel’s time records may also prove important when a hearing is actually held. This is partly because the hearings are generally held before a trier of fact who did not observe the work done by both counsel during the trial, motions and other litigation practice including appeals.
It is this latter situation, that is, where a hearing actually was held, which presents the context in which the question of the availability of a titled spouse’s attorneys’ time records is presented in the instant case. Because counsel for the titled spouse here has indicated that an appeal will be taken from my order for the production of time records, this case presents an opportunity for the Appellate Division to rule upon a practice which, I have argued, preserves court resources, avoids delay, decreases difficulties for the nontitled spouse, and thus also prevents impermissible gender discrimination.
THE ZIRINSKY PARADIGM
Faced with problems like those discussed above, matrimonial Judges working in the common-law tradition have crafted *991 a number of specialized techniques and remedies intended to streamline matrimonial litigation, decreasing delay and costs for parties and the court system itself. A prime example of such techniques is court designation of a single, unbiased expert to offer her/his opinion on valuation questions in equitable distribution. The advantages are obvious — saving money, time and the accompanying difficulties of adjudication presented by the utterly disparate testimony of two "hired guns”. No party sacrifices her/his rights,[12] and the likelihood of a just determination is increased.
Designation of an expert without objection was a relatively widely employed technique in IAS matrimonial parts, but it did not receive the imprimatur of appellate approval until Justice Jacqueline Silbermann’s thorough decision in Zirinsky v Zirinsky (138 Misc 2d 775 [Sup Ct, NY County]) was appealed and affirmed (138 AD2d 43 [1st Dept 1988]). Designation of experts in all fields in accordance with Zirinsky is now standard practice in matrimonial cases.
Like the court’s selection of experts with its various resulting economies, the ability of the court to require the time records, or equivalents, of counsel to a titled spouse under appropriate circumstances may also improve and shorten the process by which counsel fees for the nontitled spouse are determined and awarded.
PROCEDURAL POSTURE
Plaintiff moved for an order pursuant to CPLR 4403 confirming in part and modifying in part the recommendation of Special Referee Marian Lewis dated August 4, 1989, and upon modification, increasing the total amount of counsel fees awarded from $70,000 to $100,000; directing defendant to pay plaintiff’s unpaid counsel fees in the sum of $68,500 in connection with this action; and directing defendant to pay disbursements of $4,445.56. Defendant cross-moved for an order disaffirming the recommendation of the Special Referee in its totality and finding that plaintiffs counsel is entitled no award of counsel fees on this record.
At oral argument of the motion, after reading the Referee’s *992 report, I suggested that defendant’s counsel provide information concerning the hours it had spent, since, as discussed infra, the Referee’s main problem with plaintiffs claim was her inability to substantiate the time claimed from plaintiffs counsel’s records. I reasoned that if the hours expended by defendant’s counsel were substantially greater than that claimed by plaintiffs counsel, the latter could be reasonably sustained even in the absence of acceptable documentation. On the other hand, if defendant’s counsel had spent many fewer hours, plaintiffs claim could not be persuasive, and any reasonable reduction recommended by the Referee would stand.
Defendant’s counsel declined, arguing that I had no authority to go outside the record of the Referee’s hearing, and that plaintiff had not previously raised the issue. Since the question of the court’s power after a reference had not been briefed, additional submissions were requested and subsequently made. The legal issues they address are discussed infra.
BACKGROUND
This action for separation was commenced in 1984 and was tried before me in the fall of 1986 and early 1987. A decision awarding plaintiff maintenance was rendered on May 1, 1987; the decision was subsequently modified by the Appellate Division to reduce the monthly maintenance payable to plaintiff. That decision further awarded plaintiffs attorney $15,000 as a partial payment of counsel fees, without prejudice to an additional award of fees. When defendant refused to consent to a determination of the amount of such additional fees on papers, the issue was referred to a Special Referee to hear and report.
Hearing was commenced on May 24, 1988 and, after seven trial days, was completed on February 6, 1989. Plaintiff’s attorney sought to recover the sum of $130,754.73. At the hearing six attorneys from the firm testified to the work done from the inception of the case. Additionally, the firm produced its entire case file, consisting of over 10 Redweld files.
In her report, the Referee found the billing rates of the attorneys and paralegals who worked on this case to be reasonable and appropriate in view of their respective qualifi *993 cations.[13] She also found that the results achieved for the client were “very favorable”[14] and that “defendant generally indulged in litigation overkill”, necessitating plaintiffs legal expenditures.[15] Her problem with plaintiffs request for some $130,000 centered almost entirely on the quality — or lack of quality — of plaintiffs counsel’s time records.
Referee Lewis found that the records kept by plaintiffs attorneys, at least in regard to this case, were “deplorable”, and “generally so skimpy that [the attorney who testified] had to resort principally to conjecture to correlate activity to any particular phase of the litigation”. Because particular entries of work on the case could not be tied to specific litigation activities (i.e., a notation of work on an “appellate brief’ could not be correlated with any of the several appeals in the case), there was no way to determine whether attorneys were double or triple billing for the same services.
The Referee also found that disbursement records were in an even worse condition, and were in fact demonstrably inaccurate. Based on these "deplorable” records, the Referee determined the reasonable value of the legal services rendered to plaintiff at approximately half of what had been requested, or $70,000, inclusive of all payments already made and exclusive of disbursements; disbursements were found to total $4,445.56, including all transcripts. The Referee made no report or recommendation with regard to the proportion, if any, of such expenses that should be borne by each of the parties, since that issue was not referred to her.
APPLICABLE LAW

The Power of the Court After a Reference

Pursuant to CPLR 4403, “the judge required to decide the issue may confirm or reject, in whole or in part * * * the report of a referee to report; may make new findings with or without taking additional testimony; and may order a new *994 trial or hearing.” This language imposes virtually no restrictions on the use to be made of the report, permitting everything from confirming it in its entirety to conducting a trial de nova. (See generally, Matter of Galiber v Previte, 40 NY2d 822 [1976]; 4 Weinstein-Korn-Miller, NY Civ Prac ¶¶ 4001.06, 4320.11, 4403.05.)
A Referee’s report is intended as an aid, " 'to inform the conscience of the court’ ” (Matter of Gehr v Board of Educ., 304 NY 436, 440 [1952]) and the court is empowered to ''make new findings with or without additional testimony” (CPLR 4403). This broad grant of discretion clearly includes the power to call for additional evidence necessary or helpful in resolving the referred issue, whether or not such evidence was requested before the Referee.

Basis for Determining Counsel Fees

The law is well settled that an award of attorney’s fees should be reasonable in light of the skill, experience and background of counsel, the nature of the services rendered, the difficulty and complexity of the issues of fact and law involved in the case, as well as the time actually spent on the case (e.g., Willis v Willis, 149 AD2d 584 [2d Dept 1989]; see, 2 Foster-Freed-Brandes, Law and the Family New York, § 3:48, at 465 [1988 ed]). The obstructionist and/or dilatory tactics of the opposing side may also be considered (see, Mulligan v Mulligan, 54 NY2d 614 [1981], affg 79 AD2d 721 [3d Dept 1980]; Rados v Rados, 133 AD2d 536 [4th Dept 1987]; Schussler v Schussler, 109 AD2d 875 [2d Dept 1985]).
The Referee was able to, and did make findings as to all these factors except "time actually spent”. Although she characterized the legal issues raised as not especially difficult, this case was extensively litigated, as her summary of the proceedings in the action confirm. She wrote:
"[Plaintiffs counsel] prepared a Verified Complaint; reviewed the Answer; served an Amended Verified Complaint; prepared a Reply and an application for temporary support, which was opposed. A statement of net worth was prepared; a motion for reverse summary judgment was made, opposed, and denied. There were four appeals in this case * * * and 11 appearances in the Appellate Division * * *. An income deduction order was sought and a protective order. Various discovery devices were employed or fought in August/September 1984; there was a motion for a protective order, and to vacate a Notice of Examination Before Trial; a motion to *995 strike interrogatories; a motion for leave to reargue, which was denied; a notice for D&I and a notice of motion for clarification [sic] of a previous decision. In early 1985, Dr. Match made a motion for the right to rent out real property owned by the couple. Both parties were examined at a deposition. Interrogatories were prepared and responded to. In July of 1985, there were motions to strike the Note of Issue which has been filed and for counsel fees. There were extensive written settlement negotiations, and an income execution was filed.
"There was an Order to Show Cause to inspect and inventory the contents of the marital apartment at 800 Fifth Avenue. There was correspondence with respect to the auto registration on the car Mrs. Match was using, and litigation over the two apartment units in Easthampton.
"In September of 1986, trial preparation commenced in earnest. In October of 1986, defendant made a motion to dismiss the second cause of action in the complaint. There was a motion requesting release of marital funds in mid-January, 1987 and an application for additional maintenance on February 5th. On January 26th, 1987 there was an oral application re medical insurance. This action was tried September 23, December 2 and December 10, 1986 and January 6, 1987; the trial resulted in the Judgment of September 23rd and the Order with respect to maintenance entered May 1,1987.”
The Referee’s findings concerning the nature and quality of the services rendered are consistent with my own observation as the IAS Judge, as is her finding of litigation overkill by defendant which necessitated substantial additional work by plaintiff’s counsel.
Under these circumstances, the failure of plaintiff’s counsel to keep detailed time records should not serve to deprive the firm of reasonable compensation for the work performed, particularly where there is a simple, alternative means to determine whether the time counsel claims to have spent is reasonable for the work performed. Opposing counsel’s time records are, under these circumstances, relevant, appropriate and necessary as a benchmark for my determination of the reasonableness of the fees sought by plaintiff’s counsel.[16]
*996 CONCLUSION
Defendant’s counsel is directed to produce its time records on this case within 15 days of service upon it of a copy of this order with notice of entry. Counsel may, of course, delete all references to the dollar amount actually billed to defendant, since only the amount of time expended on this matter is relevant and necessary to the question of reasonableness of the fees. Pending receipt of these time records, the motion is held in abeyance.

. Although the issue of counsel fees paid by the titled spouse may sometimes be relevant as, for example, in a claim for dissipation under Domestic Relations Law §236 (B) (5) (d) (11), the issue here is not fees, which may vary by billing rates, but time spent.

. Generally, it would be preferable not to have the actual records; an attorney’s affirmation, or even oral representation as to hours spent would suffice. In my practice over the past four years in a matrimonial part, where my power to require such showing has not been challenged, the oral representation of counsel has usually been enough to resolve the particular dispute in question.

. Another of the advantages which counsel for the titled spouse enjoys is freedom from that judicial/public scrutiny of billing practices, handling of the case, etc., which occurs in a fee hearing.

. It is self-evident that the parties to a matrimonial litigation are best served by a prompt resolution of their disputes. Such resolution decreases the friction which inevitably accompanies litigation, and allows financial matters to be settled so the parties can make realistic choices about their futures. Delay, on the other hand, prolongs the opportunities for hostility and anger, and may place the warring spouses in a kind of financial limbo which can have profound effects on them and their children.

. It has been my observation that where a substantial share of the marital assets have been expended in litigation, counsel will reduce and sometimes even waive their fees or outstanding balances in order not to leave their clients impoverished. In this unofficial and unreported fashion, many members of the matrimonial bar are already engaged in unintended, but nonetheless real "pro bona representation.”

. They include entering into "settlement” without independent counsel, retention of less experienced or competent counsel with concomitant litigation disadvantages, and an inability to fully pursue necessary discovery or other remedies, including appeal.

. Although, under the IAS system, it would clearly be preferable to have fee determinations made by the Judge who has handled the case from its inception through trial, including discovery matters, interim motions, pendente lite relief, etc., crowded and extended Trial Calendars make this nearly impossible. The instant case is the perfect example. In the seven hearing days spent evaluating the services of plaintiffs counsel, an average of two matrimonial trials and one hearing could have been tried and completed.

. Because the Referee was not involved in the litigation, it is more difficult for her to ascertain the necessity for particular efforts made by counsel, and to assess the quality of the work, particularly untranscribed oral arguments, conferences and actual trial performance. In addition, as here, where the attorneys "waive” the minutes and the hearing is held over an extended period of time, the Referee must rely on her notes in making frequently complex findings.

. A reference may be made without the consent of the parties, but unless mutual consent is obtained, the Referee may only hear and report, not actually determine the issues sent to her. (CPLR 4317; see generally, Schanback v Schanback, 130 AD2d 332 [2d Dept 1987].)

. Where, as here, the Referee only hears and reports, a kind of hybrid quasi-appellate process results. Like an appellate court, the IAS Judge may review the Referee’s findings and recommendations, but unlike the ordinary appellate process, there will frequently be no written record other than the Referee’s report. Further, also unlike the appellate process, the IAS Judge may have great familiarity with the case, the issues, and the attorneys involved.

. Like trial courts, the Referees are also overburdened, with even fewer resources, and there are now delays of a year or more before a reference hearing can be held. Here, for example, the reference was made *990 on September 6, 1987, and the matter continued over 12 months. The final hearing day was in February 1989, and the matter was not fully submitted until April 1989. This inevitable and unavoidable attenuation of the hearing process, as well as the time elapsed between hearing and the proceedings for which fees are sought, make the Referee’s already difficult job even more problematic.

. Designation of a court-selected expert does not bar either party from her/his right to call any relevant and competent witness, including her/his own expert, but it generally provides a reasonable disincentive.

. The Referee praised the allocation of much of the work to paralegals which, she found, "in many cases obviated the necessity for use of a licensed attorney with a commensurately higher billing rate.”

. Although defendant argues that the Appellate Division’s modification of the maintenance awarded after trial justified "the need for extraordinary efforts on [the] client’s behalf,” he fails to note that numerous other issues, involving 11 appearances before the Appellate Division, resulted in affirmance of the wife’s position.

. She wrote, "[t]he defense tactics unnecessarily protracted and exacerbated the course of the litigation.”

. In view of the extensive nature of these proceedings defendant’s contention that the reasonable value of the legal services performed on plaintiff’s behalf should be limited to the $15,000 in counsel fees already paid by defendant is unpersuasive. It is clear to me, as the Justice who *996 presided over all of these proceedings at the trial level, that counsel for both parties invested a tremendous amount of time in preparing papers and making appearances necessary on all motions made. Plaintiff’s counsel was always well prepared, both for oral argument and trial, and all papers submitted by the firm were well drafted and of high quality. Additionally, although I am not personally familiar with the proceedings in the Appellate Division, I am cognizant of the fact that both plaintiff’s and defendant’s attorneys expended a substantial amount of time and effort on the four appeals defendant took to the Appellate Division, three of which were won by plaintiff.