Matter of Kenneth C. v Delonda R. (2006 NY Slip Op 50026(U))

[*1]

Matter of Kenneth C. v Delonda R.

2006 NY Slip Op 50026(U) [10 Misc 3d 1070(A)]

Decided on January 4, 2006

Family Court, Kings County

Hepner, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 4, 2006

Family Court, Kings County
In the Matter of Kenneth C., Petitioner,
against
Delonda R., Respondent.
VXXXXXX/02

Rebecca Fort, Esq., for the Petitioner
Santoriella, DiTomaso P.C.
335 Adams Street, Suite 2720
Brooklyn, New York 11201
Elliot Green, Esq., for the Respondent-Movant
26 Court Street, Suite 1215
Brooklyn, New York 11242
Pamela Branch, Esq., Law Guardian
Children's Law Center
44 Court Street, 11th Floor
Brooklyn, New York 11201

Paula J. Hepner, J.
This case raises the difficult and troubling questions of whether a counsel's ex parte contact with a court-appointed forensic psychologist is unethical and whether such contact irreparably compromises the court-appointed expert's independence and neutrality.
BACKGROUND
Eight months after the forensic evaluation was completed and five months after the trial began on the nine pending supplemental petitions to modify a prior order of custody and hold each of the parties in contempt for various violations,[FN1] counsel for the Respondent filed an Order to Show Cause on November 28, 2005 seeking to have the Court "order the parties to submit to an updated forensic evaluation" and permit the forensic evaluator "to review the case records of Winthrop Beacon Family Center." In support of these applications, Respondent's counsel made reference to "contacts" he had with the court-appointed forensic psychologist in September 2005 and that he had "requested an opinion as to whether an updated forensic was warranted based on his review of documentary evidence and recent developments between the parties."[FN2] Attached to the moving papers is a copy of a fax memorandum sent to Respondent's counsel on November 3, 2005 indicating that "[the doctor] believes updated forensics are warranted in this matter, in light of the new developments outlined in your letter."[FN3]
At oral argument on the motion, the Law Guardian informed the Court she became aware the Respondent's attorney sent letters to the forensic evaluator.[FN4] In colloquy it was learned that letters were sent on September 22, 2005 and on October 9, 2005 and that both were ex parte communications between Respondent's counsel and the forensic psychologist as neither the Law Guardian nor Petitioner's counsel were given copies at the time either letter was sent. Although Respondent's counsel informed the Court that a copy of the letter dated October 9, 2005 was [*2]faxed to the Petitioner's attorney and the Law Guardian on November 15, 2005, he had no receipt for these transmissions and the Petitioner's attorney denied receiving the fax as well. Respondent's counsel made no reference to either of these letters in his Order to Show Cause. When asked why copies of the letters were not sent to the Law Guardian and Petitioner's counsel, Respondent's counsel told the Court, "When I spoke to [the Law Guardian], she indicated that it was a process to cc' counsel letters to the doctor. I was not aware of the process. I checked the (inaudible) records. Nothing in (inaudible) requires it."[FN5]
In her Affirmation in Response to the motion, the Law Guardian attached a copy of the first ex parte letter written by Respondent's counsel to the forensic psychologist on September 22, 2005. Along with this letter Respondent's counsel enclosed copies of the "ACS investigation concerning the medical neglect allegation against the [father] which was indicated."[FN6] Additional records were forwarded by Respondent's counsel to the forensic psychologist[FN7] and he also offered to provide him with a transcript of the Petitioner's trial testimony. In this letter Respondent's counsel informed the court-appointed expert of additional materials in the Court's possession that could be made available "if [he] would like to review them." Midway through this letter, Respondent's counsel expressed a willingness "to meet with you to discuss the case...once you have reviewed these records." The letter concluded with a reference to the Petitioner having the subject child "repeatedly...undergo gynecological examinations" and Respondent's counsel recounted a total of four examinations he believes the child was subjected to by the Petitioner. The letter closed with a request that the forensic evaluator "reconsider [his] prior custody recommendation and consider revaluating [sic] the parties."
Evidently when there was no response to his September 22, 2005 letter, Respondent's counsel sent a second letter to the forensic psychologist on October 9, 2005.[FN8] In that letter Respondent's counsel wrote, "there have been several serious developments that I submit would effect your ultimate conclusion in regards to custody and visitation" and he enumerated them as:
"ACS investigation that [the mother] did not sexually abuse her daughter and that the allegations were fabricated by [the father];
[The father] having the subject child evaluated for sexual abuse on four separate occasions and conducting his own examination of her vagina with a flashlight;
[*3]
[The father] self-medicating [the child] and filing a prescription for [the child] that did not have a refill and providing her with the medication;
[The father] having been found by ACS to have medically neglected [the child]; and
[The father] having outbursts at ACS and Winthrop Beacon."
In this letter Respondent's counsel informed the forensic psychologist that he "had in his possession records from Winthrop Beacon"[FN9] and to contact his office "if you believe you should review these records which include critical information in regards to family counseling and individual counseling...or reinterview the parties."
II.THE PARTIES' CONTENTIONS
Petitioner's counsel's Affirmation in Opposition dated November 2, 2005 argues that the allegations of outbursts made by her client at ACS and Winthrop Beacon Family Services are unsubstantiated and that the statement that ACS has found her client to have medically neglected the child is false.[FN10] She implores the Court not to condone the inappropriateness of Respondent's counsel's conduct in contacting the forensic evaluator with "unsubstantiated allegations and knowingly false information."[FN11]
The Law Guardian similarly objects to Respondent's counsel's inappropriate conduct and opposes any updated evaluation for a variety of reasons. First, the Law Guardian argues the Petitioner would be prejudiced since the trial is underway and he has completed his direct testimony.[FN12] Second, the Law Guardian does not believe the initial report originally completed on March 1, 2005 is outdated. Third, the Law Guardian fears that too much time will be lost if an updated evaluation is ordered based on the excessive amount of time it took to complete the initial assessment as a result of the need to interview and reinterview the parties following their repeated reports of abuse or neglect to ACS against one another and their uncooperativeness with [*4]each other and the assessment process.[FN13]
At oral argument Respondent's counsel advised the Court that his sole purpose in contacting the forensic psychologist was to solicit his opinion about whether an updated report was necessary and to have "substantiation" for his motion without which he would be wasting the court's time with an application that was lacking "a sufficient legal basis."[FN14] Having searched through the ABA Guidelines on Law Guardian representation of children, Respondent's counsel asserted he found nothing to prohibit him from making direct contact with the forensic expert particularly since the expert is not a "party" who is represented by counsel.[FN15] Moreover, Respondent's counsel argued that since a law guardian is permitted to contact a forensic expert under the ABA's child advocacy guidelines, he did not see why the attorney for the Respondent should not be afforded the same opportunity.[FN16]
Respondent's counsel submitted a Reply to the Answering Affirmations of the Petitioner's counsel and the Law Guardian to which he attached records from ACS which purportedly substantiate the Petitioner's outbursts at that agency and their case of medical neglect against him. Respondent's counsel defended the propriety of his contacts with the court-appointed expert citing two cases that address the inappropriateness of a judge having ex parte contact with a forensic expert[FN17] and one case permitting an attorney to attend a forensic evaluation.[FN18] Additionally, he claimed the "case law is silent as to whether a party may provide a forensic evaluator with documents that only became available after completion of the forensic evaluation."[FN19]
Decision was reserved in order to research the applicable statutes, history and case law pertaining to the two questions set forth at the beginning of this opinion as a determination on the relief sought in this motion is dependent upon how these [*5]questions are answered.
III.THE LAWYER'S ETHICS
Both the Model Rules of Professional Conduct adopted by the American Bar Association[FN20] and the New York State Bar Association's Lawyers Code of Professional Responsibility[FN21] contain provisions that prohibit ex parte communications with persons or parties represented by a lawyer. In 1993, the ABA Standing Committee on Ethics and Professional Responsibility was asked for its opinion on "whether a lawyer representing a client in a civil matter may initiate ex parte contact with an expert witness retained to testify for the opposing party without first obtaining permission from the opposing counsel."[FN22] In response to the stated question, the Standing Committee expressed the view that "none of these Model Rules, or their predecessors in the Model Code, estab-lishes an automatic bar to lawyers initiating contact with the opposing parties' experts. Rule 4.2 only prohibits a lawyer from communicating with a party who is represented by another lawyer in the matter without consent. No Model Rule extends this protection to witnesses or explicitly treats expert witnesses differently from fact witnesses."[FN23]
Notwithstanding this position, however, the Committee cautioned that such conduct could "implicate" other Model Rules notably those which pertain to falsifying evidence or assisting a witness to testify falsely, knowingly disobeying an obligation under the rules of a tribunal, and making a false statement of material fact or law to a third person.[FN24] The Committee therefore concluded that, "although the Model Rules do not specifically prohibit a lawyer in a civil matter from making ex parte contact with the opposing party's expert witness, such contacts would probably constitute a violation of Rule 3.4(c) if the matter is pending in federal court or in a jurisdiction that has adopted an expert-discovery rule patterned after Federal Rule 26(b)(4)(A).[FN25] Conversely, if the matter is not pending in such a jurisdiction, there would be no [*6]violation."[FN26]
Interestingly, the New York State Bar Association's Committee on Professional Ethics also was asked to respond to an inquiry about whether an attorney may "com-municate with an expert witness retained by an adversary without the knowledge, per-mission, or consent of opposing counsel."[FN27] Like their colleagues on the ABA Standing Committee, New York's ethics committee began their analysis with a discussion of whether the word "party" in DR 7-104(A)(1) includes an expert witness retained by a party in an adversarial context. Referring to a prior opinion from 1972 in which their predecessors determined that "communication with non-party adverse witnesses with-out the consent of opposing counsel is ethically permissible under the Code of Profes-sional Responsibility,"[FN28] the Committee reflected upon whether an expert witness retained by a party should be treated differently under the disciplinary rules than an ordinary witness. Finding no ethical rule or policy which would justify a different interpretation of DR 7-104(A)(1), the Committee concluded that ex parte communi-cation with an adversary's retained expert is "ethically permissible."
Mirroring the ABA's approach, the New York's committee also intimated that ex parte contact with an adversary's expert might not be consistent with the discovery provisions set forth in Rule 3101(d)(1) of the New York Civil Practice Law and Rules.[FN29] Citing the Ninth Circuit's opinion in Campbell Industries, they declined to express any "opinion on the application of these statutes and rules to ex parte communications with an adverse party's expert witness, or whether such conduct might violate court rules or policies relating to discovery and disclosure." Rule 3101(d)(1) is far more restrictive than its federal counterpart in terms of what contact is allowed. Consistent with this ethics opinion, there is some case law involving ex parte communications with expert wit-nesses where trial courts imposed sanctions upon counsel who initiated unauthorized contact with their adversaries expert witnesses upon grounds other than a violation of DR 7-104 (Carroll v Nunez, 146 Misc 2d 422 [Sup Ct Ulster County 1990]; Robinson v State of New York, QDS:04703233, 9/26/2000 NYLJ at 27 (col. 1) [Ct Cl 2d Dept]).[FN30] If contact with [*7]an expert witness is so narrowly circumscribed during the formal discovery process what basis is there to assume, absent a specific directive from the court authorizing it,[FN31] that contact of an informal nature would be permitted for a purpose other than discovery?
In defending his conduct, Respondent's counsel argued his right to contact the forensic expert should parallel the freedom of contact which the law guardian enjoys under the Law Guardian Representation Standards. Published in November 1999 by the New York State Bar Association's Committee on Children and the Law, Volume II of The Guide to Representing Children contains the "Law Guardian Representation Standards for Custody Cases." In regard to pre-trial duties, Standard B-5 states, "The Law Guardian should prepare thoroughly for trial." The Commentary explains that while "the nature of preparation depends upon the case," examples given include pre-trial discussions with experts who will be called upon to testify, and the preparation of witnesses whom the Law Guardian may call to testify.[FN32] It would appear that Standard B-5 is consonant with the ethics opinion issued under DR 7-104(A)(1), at least in regard to party-retained experts. Given the pre-trial discovery limitations imposed by CPLR 3101(d)(1), however, the breadth of Standard B-5 may not be reconcilable with that statute. For this reason Respondent's counsel's reliance on these child custody standards and commentaries to condone his conduct is misplaced.
Although not mentioned by Respondent's counsel in his defense, the Court searched for position papers and policy statements from the American Academy of Matrimonial Lawyers to discern whether this subject has come to their attention. In 2002 the Academy issued the second edition of the Bounds of Advocacy: Goals for Family Lawyers. While its purpose "is to guide matrimonial lawyers confronting moral and ethical problems...as existing codes often do not provide adequate guidance," none of the eight substantive areas discuss the subject of permissible conduct or contact between the attorneys and either party-retained or court-appointed experts.[FN33]
Finally, the Court consulted the Uniform Rules of the Trial Courts (22 NYCRR) pertaining to party-retained and court-appointed experts. Section 202.16(g) establishes timetables for serving responses to demands for expert information under CPLR 3101(d)(1) and for the exchange of written reports from the retained experts who will be called to testify on behalf of the parties. Section 202.18 authorizes the court to appoint experts to testify about custody or visitation, equitable distribution or a distributive award "in any action or proceeding tried without [*8]a jury to which section 237 of the Domestic Relations Law applies." Neither of these court rules impose guidelines regulating contact between the expert witness, the parties or their counsel.
IV.COURT-APPOINTED EXPERTS
As the foregoing discussion makes clear, ex parte contact or communication with an expert witness retained by an opposing party is not a violation of the Rules of Professional Conduct or the disciplinary rules pertaining to ex parte communications.[FN34] Whether the same interpretation would have resulted if the question asked of these ethics committees had concerned an ex parte contact between counsel for the parties and a court-appointed expert is far from obvious because of historical factors that distinguish court-appointed experts from experts who are retained by a party.
Reliance on expert witnesses has become a prominent feature of civil litigation as more and more cases involve issues that depend on expert knowledge for their resolu-tion. Despite their prevalence, the use of expert witnesses has always been controversial. In his Treatise on the Law of Evidence, first published in 1848, Judge John Pitt Taylor wrote "[p]erhaps the testimony which least deserves credit with a jury is that of skilled witnesses...[I]t is often quite surprising to see with what facility, and to what extent, their views can be made to correspond with the wishes and interests of the parties who call them."[FN35]
How these experts' views "can be made to correspond with the wishes of the party who calls them" is attributable to the unfettered ability of the attorneys who retain them to direct, control and shape their testimony.[FN36] The system of using party-controlled experts has many shortcomings, chief among them "the ability of partisan experts to obfuscate issues...giv[ing] one side an unfair advantage," and the "evidentiary stalemate" that results when "two experts with diametrically opposed views...leave the court in little better position than when it started."[FN37] This model permits parties with greater financial resources to "hire not only better experts, but also [*9]more experts."[FN38] When litigants can "shop" for an expert whose opinion is favorable to their case, "the court hears only those opinions that the parties want it to hear"[FN39] particularly when the opposing party may be financially unable to hire any expert at all. Cross-examination, the technique relied upon to ferret out bias, deficient methodologies or factual inaccuracies in an expert's opinion, depends on the competence of the lawyer asking the questions and will be less piercing if the resources at that attorney's disposal are not comparable.[FN40]
By 1923, when the second edition of Wigmore's Treatise on Evidence appeared, as a remedy for these ills, he proposed to "remove the partisanship of the expert witness" by designating "the State, not the party, shall be the one to pay his fee, and . . . the Court, not the party, shall be the one to summon him."[FN41] The federal courts and more than thirty states and territories have "adopted explicit provisions for court-appointed experts...[and] many cases have held that judges have the inherent power to call expert witnesses, even without specific statutory authorization."[FN42] In New York, trial judges have inherent authority to appoint experts as technical advisors to assist the court. Unlike the federal rules, "New York has yet to codify the common law doctrine encompassing the trial court judge's discretion to appoint expert witnesses in a court proceeding,"[FN43] relying instead upon the "common law along with a host of statutes, which address specific areas of the law."[FN44] The ability of the court to appoint experts to conduct "an impartial, out-of-court evaluation of the factors bearing on the custody" of the children before them was sanctioned in Kesseler v Kesseler (10 NY2d 445, 448 [1962]).[FN45] Utilization of neutral, independent, court-appointed, forensic evaluators has been chosen as an alternative to the "battle of the experts" in child custody litigation because it retains the adversarial nature of the process while at the same time minimizing the abuses.[FN46]
[*10]
As the authors of these law review articles point out, the perceived benefit of using court-appointed experts is overcoming the mistrust of party-controlled experts by having a neutral person, independent from the parties and any other influences, assess the competing theories, causations, elements and factors involved and reach a conclusion that is fair, balanced and reasonable in light of all the evidence. The utility of having the court designate a single, unbiased expert to offer an opinion is that it "decreases delay and costs for parties and the court system, and...eliminates the difficulties of adjudication presented by the utterly disparate testimony of two hired guns'" (Match v Match, 146 Misc 2d 986, 990-991 [Sup Ct New York County 1990]).[FN47] Although "designation of a court-selected expert does not bar either party from her/his right to call any relevant and competent witness, including her/his own expert," the trial court in Match felt "it generally provides a reasonable disincentive"(id.). Most import-antly, in custody cases a court-appointed expert offers a broader view of the dynamics and functioning of the family because the evaluator has access to all members of the family as well as the children and is preferable because it minimizes the exposure of the children to the emotional stress of partisan litigation by reducing the number of times the children have to be interviewed and the number of people the children have to see.
Using rule 706 of the Federal Rules of Evidence as a reference point since New York has not codified the common law practice, it is the court that appoints the expert, determines the scope of the expert's duties, establishes a reasonable compensation for the expert's services and determines how it will be paid. Upon acceptance of the appointment, the expert witness is subject to the Court's directives and no others. In order to preserve the characteristics of neutrality and independence, should an expert witness appointed by the Court be treated as a "person" or "party" represented by a lawyer and come within the purview of Rule 4.2 of the Model Rules and DR 7-104 of the Code of Professional Responsibility (22 NYCRR 1200.35), so that ex parte [*11]contact or communication between the attorneys for the parties and the expert would be prohibited?
V.CIVIL TRIAL PRACTICE STANDARDS 
Drafted by a Task Force of the American Bar Association's Section of Litigation and adopted in February 1998, these standards were developed "to address practical aspects of a trial that are not fully addressed by rules of evidence or procedure."[FN48] Section 11 of Part Two, "Judicial Participation in Developing Evidence," deals with "Court-Appointed Experts." Subsection (d) sets forth standards relating to "Communi-cations between Parties and Experts." It specifies that "the court should ensure that every party is: i) Informed of, and afforded the opportunity to explore, in advance of trial, the findings and opinions of any court-appointed expert; ii) Aware of all communi-cations between any party and a court-appointed expert by: a) Permitting all parties to be present when any party meets or speaks with the expert, or b) Providing that all communications between any party and the expert will be in writing with copies to all parties."[FN49] The Commentary to this Standard contains a caveat in relation to subdivision (d)(ii) which is that it "is operative only if the court has not prohibited ex parte com-munications between the parties and a court-appointed expert...[but even then recog-nizing] "that, if the court-appointed expert is to testify at trial, the expert will be subject to the same type and degree of discovery (e.g., deposition, disclosure, interrogatories) as a party-proffered expert."[FN50] Before these Standards were finalized, the Task Force distributed them "for public comment to every state and major local bar association" among others.[FN51] These standards have not been implemented in New York by statute or local court rule.
In the absence of a statute or court rule specifically regulating contact and communication with court-appointed experts, it is not necessary to strain the plain meaning of the language in Rule 4.2 or DR 7-104 to achieve greater protections for court-appointed expert witnesses. Limitations similar to those set forth in the Civil Practice Trial Standards could be incorporated into any court order appointing an expert.
This is the practice followed in the federal courts. In Leesona Corporation v Varta Batteries, Inc., 522 F Supp 1304 [SD NY 1981], the Court set forth the scope of the expert's duties, the documents to be provided by each of the parties, the technical questions each party wanted the expert to consider and "all communication with the court expert was done through the Court, and copies of all materials sent by the Court to [the expert] were docketed by the clerk and placed in the court file." In Crawford v Greater Cleveland Regional Transit Authority (1991 WL 328037 [ND Ohio 1991]) the Court ordered that its expert "shall not make any ex parte communications with either parties' counsel(s). If [the Court's expert] needs to speak with one or both of the parties' counsel, she must have the other party's counsel present in person or via a [*12]conference call."In defending his actions, Respondent's counsel argued in his Reply papers that "the initial 722-c order did not prohibit any party from contact [sic] the forensic evaluator."[FN52] The orders appointing the forensic expert in this case were issued by two former judges of this court and neither order set forth any conditions governing contact or communications between the forensic psychologist and counsel. In light of what transpired between Respondent's counsel and the forensic psychologist, and in keeping with the practice in the federal courts, until such time as New York enacts a statute or implements a court rule to clarify the relationship of court-appointed experts to DR 7-104, this Court's future orders will incorporate specific terms and conditions governing the conduct of counsel as well as the forensic expert[FN53] to prevent a repetition of the situation that arose in this case.
VI.THE FORENSIC EXPERT'S ETHICS
One survey of civil trials estimated that experts appear in 86% of the cases with an average of 3.8 experts per trial.[FN54] While expert witnesses are appearing in civil cases in increasing numbers, the topic of expert witness ethics and professionalism is largely undeveloped and there are few definitive statements about what exactly the expert witness's ethical obligations are and how they are to handle the subtle as well as the more blatant attempts to influence them.[FN55] While some expert witnesses belong to pro-fessions that have an established code of ethics [*13](accountants, psychologists, physicians), many experts come from professions that are not self-governing with a uniform code of conduct (software developers, musicians, zoologists). Even where professional associa-tions have established ethical guidelines for conducting investigations, forming opinions and writing reports, very few explain how the ethical boundaries imposed on judges and lawyers may bear on the performance of their role in the legal system regardless of whether they are employed as a retained forensic expert for one of the parties or as a court-appointed expert.[FN56]
In preparing this opinion, this Court reviewed the guidelines of the principal professional organizations in which forensic experts in custody cases (psychiatrists, psychologists, social workers) are most often affiliated. Of prime importance for purposes of the issues before this Court are the 1994 "Guidelines for Child Custody Evaluations in Divorce Proceedings" created by the American Psychological Association. They are an extension of the "Ethical Principles of Psychologists and Code of Conduct" developed in 1992 and revised in 2002. The 1994 guidelines discuss the purpose of a child custody evaluation, preparing for a child custody evaluation, and the procedures for conducting a child custody evaluation. The 2002 Ethics Code recognizes that psychologists are engaged in forensic activities as expert witnesses but limits the discussion to the need to clarify roles and the limits of confidentiality. Neither the 1994 Guidelines nor the 1992 Code of Conduct familiarize psychologists with the ethical issues that arise when working as a forensic expert in the judicial system.
The same is true for the American Academy of Child and Adolescent Psychiatry's 1997 "Practice Parameters for Child Custody Evaluations." Five paragraphs in a section entitled "Clinicians as Expert Witnesses" instruct psychiatrists serving as forensic experts to learn and understand the "basic family law and legal procedures in his or her state, including the statutory and case law criteria that the courts use to determine custody...whether there are presumptions favoring joint custody, and whether lawyers are appointed for the children." It contains a suggestion that the clinician find a colleague who can be a mentor during the adjustment to this new role and the unfamiliar adversarial environment. The ethical problems which can arise from the relationships of the clinician to the parties, the child, the attorneys and the judge, whether retained or court-appointed, are not mentioned.
Other documents designed to serve a similar function created by other professional associations contain little or nothing about the legal aspects of forensic work. The December 1981 Report of the Task Force on Clinical Assessment in Child Custody entitled "Child Custody Consultation," approved by the American Psychiatric Association, has a small section on testifying as a forensic expert but it is written from the perspective of an expert retained by one of the parties and does not distinguish the nuances that arise when functioning as a court-appointed forensic expert. The final section labeled "ethical principals" in the 1994 "Model Standards of Practice for Child Custody Evaluation" of the Association of Family and Conciliation Courts, contains a brief discussion of the need to disclose the pre and post-evaluation relationships with members of the family, the importance of adhering to the ethical guidelines of the person's profession, how to handle issues beyond the clinician's expertise and limita-tions on the evaluator's recommendation. There is no discussion of the expert's conduct in relation to the [*14]parties and the attorneys.
Forensic evaluators, most often not lawyers themselves and typically not represented by counsel, are unfamiliar with the ethical dimensions of their role in the legal system and how it intersects with the canons of ethics and codes of professional conduct of the lawyers and judges with whom and for whom they are working. When turning to their own professional standards of governance, they find little to help them resolve the myriad of ethical problems that may confront them as a forensic expert in a legal domain.
VII.SANCTIONS
RESPONDENT'S COUNSEL
Respondent's counsel offers a justification for his ex parte contact with the forensic psychologist that is naively appealing yet realistically unpersuasive due to the express content of both letters he sent to the forensic psychologist. From the affirmations and exhibits submitted on this motion, it is inconceivable that Respondent's counsel's contact with the forensic psychologist was for the benign purpose he embraced at oral argument. Rather, Respondent's counsel presented additional materials unfavorable to the Petitioner and information, the accuracy of which is contested, to the forensic psychologist in an attempt to influence him to conduct additional interviews which might lead him to change his previous recommendation that favored an award of sole custody to the Petitioner. Even if he believed ex parte communication was authorized, given Respondent's counsel's experience as an attorney, it strains credulity to believe he did not know it was customary practice to simultaneously send copies of correspondence with the court-appointed expert to all counsel. While his one month delay in sending copies to counsel arguably supports his claim of ignorance, it equally sustains an argument that he purposely chose not to notify counsel and give them the opportunity to object before he provided the information to the forensic psychologist.
Respondent's counsel's actions attempted to circumvent the Court's authority over the forensic expert and over the evaluation process, sought to invade the scope of the expert's duties set the judges who ordered the assessment, deprived other counsel from opposing disclosure of these materials to and further interviews by the forensic psychologist, enabled the forensic psychologist to have access to these materials before he testified, and began treating the expert to his own. In essence, Respondent's counsel's conduct introduced into this custody litigation the very abuses a court-appointed, neutral, independent forensic expert was intended to cure. By submitting these documents to the forensic psychologist and asking him to reconsider his recommendation, Respondent's counsel was attempting to try the case "to the court expert" (Leesona, 522 F Supp at 1312). While the court expert "serves to enhance the trial court's understanding...it is the court, and not its expert, that decides the case" (id.). Although Respondent's counsel's conduct is not unethical under DR 7-104, it clearly has pressed the limits of providing zealous representation within the bounds of the law. To prevent any uncertainty regarding contact between the court-appointed forensic expert and counsel, an order is made directing that there shall be no contact except as permitted under this Decision and Order.
THE COURT-APPOINTED PSYCHOLOGIST
In most disciplines, professionals are accustomed to having contact with [*15]colleagues for the purpose of testing theories, challenging hypotheses, reviewing research findings and conclusions and confirming diagnoses. When serving as a forensic expert in the context of partisan litigation, however, ex parte communications "are objectionable for two reasons: the fear that the decision-maker will become biased by hearing only one side of an issue without allowing the other party an immediate opportunity to respond and the lack of a record for subsequent review of any resulting decision."[FN57]
The Law Guardian questions the ethics of the forensic psychologist who "should have known better" since he has extensive experience serving in the capacity of a court-appointed forensic psychologist. In the Law Guardian's view, the forensic psychologist should have disregarded and returned Respondent's counsel's letters and documents rather than reviewing them and agreeing with Respondent's counsel that an updated forensic was needed. Because of these events, the Law Guardian maintains that "the forensic psychologist's neutrality" has been "placed in question" and his "anticipated testimony...irretrievably compromised" because Respondent's counsel has presented him "with significant amounts of one-sided and inflammatory material regarding the parties to this proceeding."[FN58] She requests the Court remove the forensic psychologist and appoint a different expert to prepare a new evaluation of the parties and the children" notwithstanding the delays this will cause.[FN59]
This court-appointed expert has been a forensic psychologist in private practice since 1990. From 1988-1991, he was employed as the Clinic Director and Chief Psychologist of the Bronx Family Court Mental Health Services Clinic that serves as an auxiliary service to the courts. Over the course of the last 17 years, he has conducted thousands of comprehensive diagnostic evaluations and testified in innumerable proceedings as an expert witness. Consequently, this forensic psychologist is aware that his authority derives from the Court, not the parties, and should have an appreciation that his role and responsibilities as a court-appointed expert are qualitatively different[FN60] than when he is retained by one of the parties. His knowledge and experience should have led him to handle Respondent's counsel's ex parte communications differently.
While there is judicial precedent for sanctioning forensic experts for their conduct,[FN61] from the events thus far known to have transpired, it cannot be presumed that the forensic psychologist [*16]cannot fulfill his role as an independent, neutral expert. Until the forensic psychologist testifies and he is given the opportunity to describe the events as he recalls them, it is not possible to conclude that he has lost his neutrality or that he has become an advocate for the Respondent. Indeed, because of the forensic expert's considerable experience he, like a judge in a bench trial, is accustomed to receiving quantities of information and sorting through it to determine what is pertinent to his assessment and what is not. Because the forensic psychologist issued a report with recommendations prior to the ex parte communications from Respondent's counsel, cross-examination of the forensic psychologist should reveal whether or to what extent he has been co-opted by Respondent's counsel's entreaties.
VIII.THE RELIEF REQUESTED
A.UPDATED EVALUATIONS
There is case law upholding a judge's denial of a request to order an updated psychological evaluation on the grounds that the request was untimely and that the trial was already underway (Studenroth v Phillips, 230 AD2d 247, 251 [3rd Dept. 1997]). The reports and evaluations referred to by Respondent's counsel in his letters, if admissible, could have been the subject of the forensic psychologist's cross-examination and it would not have been necessary to order a further examination of the parties in order to have them considered by the forensic psychologist. Had there been no contact between Respondent's counsel and the forensic psychologist, the Court might have been in a position to deny the motion and continue the trial as scheduled. By engaging in ex parte contact with the forensic psychologist prior to filing his motion and procuring an opinion from the forensic psychologist that additional interviews were needed, Respondent's counsel removed from the Court the choice to grant or deny the application for an updated evaluation and, on this factual record, succeeded in making the outcome a ground for reversible error if the Court were to deny the motion.
B.THE WINTHROP BEACON RECORDS
While the case records at issue may be the kind of materials psychologists, psychiatrists and social workers have historically reviewed to obtain information useful to them in preparing for a forensic evaluation, the extent to which the expert's opinion will be admissible if it relies upon any third party hearsay in those report for support, depends on whether the any of the standards in Wagman v Bradshaw (292 AD2d 84 [2d Dept 2001]) can be satisfied. In Wagman (id. at 86-87), the Appellate Division Second Department held that "to be admissible, opinion evidence must be based on one of the following: first, personal knowledge of the facts upon which the opinion rests; second, where the expert does not have personal knowledge of the facts upon which the opinion rests, the opinion may be based upon facts and material in evidence, real or testimonial; third, material not in evidence provided that the out-of-court material is derived from a witness subject to full cross-examination; and fourth, material not in evidence provided the out-of-court material is of the kind accepted in the profession as a basis in forming an opinion and the out-of-court material is accompanied by evidence establishing its reliability."
The records of Winthrop Beacon Family Center will be released to the forensic psychologist to use in conducting an updated evaluation. A thorough discussion of the admissibility of an expert's opinion which is based on third party records can be found in Lisa W. v Richard W. (2005 WL 2882454 [Fam Ct Kings County 2005]), which counsel and the forensic [*17]psychologist should acquaint themselves with in preparation for the expert's continued testimony and the continuation of this trial. Accordingly it is
ORDERED that by January 9, 2006 Respondent's Counsel is to provide the Law Guardian and Petitioner's counsel with copies of all written materials given to or received from the forensic psychologist between September 22, 2005 to December 2, 2005; and it is further
ORDERED that by January 9, 2006 the forensic psychologist is to provide counsel for the Petitioner, Respondent and the Law Guardian with copies of all written materials he received from or sent to Respondent's counsel between September 22, 2005 and December 2, 2005; and it is further
ORDERED that by January 9, 2006 the forensic psychologist is to provide counsel for the Petitioner, Respondent and the Law Guardian with copies of all landline, cellphone, fax and e-mail logs in which a record is made of any contacts or communi-cations between his office and Respondent's counsel's office without regard to which party was the initiator and which party was the recipient. In the event no such documents exist, the forensic psychologist is to serve upon all counsel a sworn statement to that effect; and it is further
ORDERED that by January 9, 2006 the forensic psychologist is to provide counsel for the Petitioner, Respondent and Law Guardian with copies of any memoranda to file generated to memorialize any contacts or communications between his office and Respondent's counsel's office. In the event no such memoranda exist, the forensic psychologist is to serve upon all counsel a sworn statement to that effect; and it is further
ORDERED that by January 13, 2006 counsel for the Petitioner and the Law Guardian may submit to the forensic psychologist any supplemental documents they believe should be considered along with Respondent's counsel's submissions and they shall simultaneously provide copies to all other counsel; and it is further
ORDERED that thereafter all counsel shall have no further contact with the forensic evaluator except as provided in Article 31 of the CPLR or as directed by the Court by further Order issued pursuant to a written motion served upon all counsel; and it is further
ORDERED that the forensic psychologist is directed to reinterview the parties for the purpose of updating his March 1, 2005 forensic report taking into consideration the intervening occurrences and documentary materials that have become available since then. The forensic psychologist shall be paid for these interviews, his review of these documents and for the preparation of a supplemental report, pursuant to Article 18-B, Section 722-c of the County Law, at a rate not to exceed $90.00 per hour to a maximum of six (6) hours; the forensic psychologist is to forthwith schedule these interviews within the next six weeks and submit his report to the court within eight weeks but no later than March 3, 2006; and it is further
ORDERED that each party will be assessed the cost of any appointment with the forensic psychologist that is missed, given the lengthy delays in completing the original forensic evaluation in this case; and it is further
ORDERED that a copy of the records from Winthrop Beacon Family Services shall be made available in their entirety to the forensic psychologist and access to the entire record shall be made available to all counsel on the terms and conditions set forth in the Court's prior order of August 10, 2005; and it is further
ORDERED that the matter is adjourned for continued trial to January 9, 2006; and it is [*18]further
ORDERED that the Clerk is to fax and mail a copy of this opinion on the forensic psychologist.
E N T E R :
__________________________
PAULA J. HEPNER, J.F.C.

Footnotes

Footnote 1: On April 30, 2003 the parties stipulated to an order of joint custody with the children (A.C., born 12/27/96 and D.C., born 12/2/97) to reside with each parent from Thursday to Wednesday on alternating weeks during the school year and with the father for the first half of the summer and with the mother for the second half of the summer. By August 14, 2003 the first petition (Supplemental A) alleging a violation was filed. The parties entered into an agreement on March 26, 2004, pursuant to an order to show cause filed in the Appellate Division, to alter the days the children were with the mother (Thursday at 6pm to Sunday at 6pm ) and with the father (Sunday at 6 pm to Thursday at 6pm). Pending before the Court presently are Supplementals G, H, I, J, M, N, O, P and Q. They include cross-petitions for sole custody, violations of the joint custody order, modifications of the joint custody order and three contempt motions.

Footnote 2: Affirmation of Respondent's counsel dated November 17, 2005 at ¶5.

Footnote 3: Exhibit #A annexed to the Affirmation of Respondent's counsel dated November 17, 2005.

Footnote 4: Transcript of 12/2/05 at 6, line 25 to 7, line 7.

Footnote 5: Transcript of 12/2/05 at 10, lines 13-18. 

Footnote 6: Exhibit #A annexed to the Affirmation of the Law Guardian dated December 14, 2005.

Footnote 7: Enclosures to the September 22, 2005 letter were listed as: "ACS domestic violence records, the ACS records concerning [the father's] allegation that the [mother] was douching the subject child, a complaint signed by [the father] requesting that [the mother] be criminally prosecuted for allegedly coming late to a visit, ACS progress notes and an evaluation from Downstate concerning the subject child."

Footnote 8: Exhibit #B annexed to the Affirmation of the Law Guardian dated December 14, 2005.

Footnote 9: Respondent's counsel obtained access to the Winthrop Beacon records pursuant to an Order to Show Cause to have Winthrop Beacon Family Services comply with the so-ordered subpoena for disclosure of the "social work notes, progress notes, referrals, diagnostic exams and correspondence, etc. with respect to the following individuals: Kenneth C., A.C. and D.C." On August 10, 2005 the Court issued an order granting inspection and review of the records on the condition that, in accordance with 45 CFR §164.512(e)(1)(v)(A), the Respondent not to make copies of or further redisclose the Winthrop Beacon records, or any part thereof, to any other individual without leave of the Court; the Winthrop Beacon records will not be allowed to leave the courthouse and arrangements for access to the record must be made with the Court's law assistant; should the Respondent seek to introduce any of the Winthrop Beacon records at trial, the Respondent will be permitted by the Court to make copies of those portions of the case record so that they can be provided to Petitioner's counsel and the Law Guardian in advance of trial.

Footnote 10: Affirmation of Petitioner's counsel dated December 2, 2005 at ¶3.

Footnote 11: Affirmation of Petitioner's counsel dated December 2, 2005 at ¶5.

Footnote 12: Trial of the issues began on June 15, 2005 with the testimony of the Petitioner. His direct examination was continued on August 9 and on August 15, 2005, the cross-examination began.

Footnote 13: The cross-petitions to modify the parties' prior order of joint custody were filed on August 23, 2003. From the time the forensic evaluation was reordered by Judge Chun on June 21, 2004, three memos from the forensic expert describing the frustrating progress of the evaluation were submitted to the Court. By August 12, 2004 the mother had not yet been seen a final time nor was her psychological testing done. As of November 9, 2004 the mother had missed two appointments to been seen with the children. On January 21, 2005 the doctor found it became necessary to reinterview the father because "one crisis seems to follow another" in this family.

Footnote 14: Transcript of 12/2/05 at 14 line 19 to 15, line 17.

Footnote 15: Transcript of 12/2/05 at 11, line 17 to 12, line 6 and at 16, lines 6-11. In actual fact, the Guidelines which authorize this are those of the New York State Bar Association not those of the American Bar Association.

Footnote 16: Transcript of 12/2/05 at 16, lines 13-18.

Footnote 17: Flynn-Federico v Federico, 8 AD3d 65 [2d Dept. 2004]; Lightman v Lightman, 253 AD2d 453 [2d Dept. 1998]

Footnote 18: Unlike the circumstances of this case, in Koons v Koons (161 Misc 2d 842 [Sup Ct NY County 1994]), counsel's presence at the forensic interview of his own client was authorized following a formal application to the court for this relief.

Footnote 19: Reply Affirmation of Respondent's counsel dated December 16, 2005 at ¶8.

Footnote 20: As promulgated by the American Bar Association in 1983, Rule 4.2 of the Model Rules of Professional Conduct states that, "In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order." The Model Rule was preceded by DR 7-104(A)(1) of the ABA's Model Code of Professional Responsibility. The provisions of the Model Code referred to a "party" represented by a lawyer not a "person."

Footnote 21: Adopted by the New York State Bar Association in 1970 and amended in 2002, Disciplinary Rule 7-104(A)(1) of Canon 7 governs "Communicating with Represented and Unrepresented Parties" and it provides that "During the course of the representation of a client a lawyer shall not communicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by a lawyer in that matter unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so."

Footnote 22: ABA Standing Committee on Ethics and Professional Responsibility, Formal Op. 93-378 [1993].

Footnote 23: (id.)

Footnote 24: ABA Model Rules of Professional Conduct 3.4(b), 3.4(c), 3.4(f), 4.1(a), 4.2 and 4.3.

Footnote 25: Rule 26 of the Federal Rules of Civil Procedure regulates discovery in the federal courts. Under Subsection (b)(4)(A) of the Rule, discovery from "experts whose opinions may be presented at trial" is restricted to the receipt of a report, if required under subsection (a)(2)(B), interrogatories and the taking of depositions. Evaluating an attorney's ex parte contact with an adverse party's expert witness in the context of rule 26, the federal courts have held this to be a "flagrant violation of the expert discovery rules" deserving of a strong sanction (American Protection Insurance Co. v MGM Grand Hotel Las Vegas, 1983 WL 25286 [D.Nev. 1983][counsel disqualified], affd 748 F2d 24 [9th Cir 1984], on rehearing 1986 WL 57464 (D.Nev. 1986][sanction upheld]; Campbell Industries v M/V Gemini, 619 F2d 24 [9th Cir 1980][expert precluded from testifying]). 

Footnote 26: ABA Standing Committee on Ethics and Professional Responsibility, Formal Op. 93-378 (1993).

Footnote 27: New York State Bar Association's Committee on Professional Ethics, Op. 577 (1986), 1986 WL 68786.

Footnote 28: New York State Bar Association's Committee on Professional Ethics, Op. 245 (1972).

Footnote 29: Rule 3101 of the New York Civil Practice Law & Rules establishes the scope of pre-trial dis-covery applicable in civil litigation. Subdivision (d)(1) of the Rule discusses the discovery available from experts upon request. Subdivision (d)(1)(iii) prohibits any other discovery from an expert witness absent court order upon a showing of special circumstances.

Footnote 30: In Nunez (146 Misc 2d at 426), the Court alluded to the range of sanctions that might be imposed if counsel did not follow its order not to contact the expert with a view to intimidating him or discouraging him from testifying." In Robinson, the Court imposed a sanction for frivolous conduct under Rule 130-1.1 of the Rules of the Chief Administrator of the Courts because an attorney established ex parte contact through a third party "for the wholly improper purpose of attempting to dissuade the individual from testifying as an expert for the complainant."

Footnote 31: In Young v Pierce, 822 F2d 1368, [5th Cir. 1987] the judge authorized the special master "to confer with the parties or their attorneys in ex parte communications, as required to fulfill his duties."

Footnote 32: The New York State Bar Association's standards differ markedly from the analogous provisions of the Standards of Practice for Lawyers Representing Children in Custody Cases issued by the American Bar Association's Section on Family Law in August 2003. Section III(F)(7) of the Standards sets forth the pre-trial duties and responsibilities of the child's attorney, in particular "participation in depositions, pretrial conferences, and hearings." The ABA Standards do not mention pre-trial contact with expert witnesses. 

Footnote 33: Preliminary Statement, Bounds of Advocacy: Goals for Family Lawyers (November 2000).

Footnote 34: (Steven D. Easton, in Can We Talk?: Removing Counterproductive Ethical Restraints upon Exparte Communication Between Attorneys and Adverse Expert Witnesses, 76 Ind. L.J. 647, 675 [Summer 2001]), identifies the salutary purposes favoring ex parte communication with expert witnesses: to gather information about the expert's background, credentials and expertise, discover the methodology used and the basis of the expert's opinion, or acquire "information that will help evaluate the case for settlement or better prepare for a cross-examination" or impeachment of the witness's testimony. 

Footnote 35: (Samuel R. Gross, Expert Evidence, 1991 Wis L. Rev. 1113, 1114)

Footnote 36: (Stephen D. Easton, in Ammunition for the Shoot-out with the Hired Gun's Hired Gun: a Proposal for Full Expert Witness Disclosure, 32 Ariz. St. L.J. 465 [Summer 2000]), describes the means attorneys have at their disposal to influence an expert's opinion: (a) by selecting an expert whose opinion is expected to be helpful to the attorney's case, (b) by becoming subject to the attorney's direction once retained, (c) by controlling access to the information which becomes the basis of expert's opinion, (d) by paying fees to the expert only so long as the opinion will advance the attorney's theory and proof of the case, (e) by leading the expert to a certain opinion through regular communications, and (f) by controlling the expert's access to the witness stand. 

Footnote 37: (Andrew MacGregor Smith, Using Impartial Experts in Valuations: a Forum-specific Approach, 35 Wm. & Mary L. Rev. 1241 [Spring 1994])

Footnote 38: (id.)

Footnote 39: (id.)

Footnote 40: (id.)

Footnote 41: (John Henry Wigmore, A Treatise on the System of Evidence in Trials at Common Law § 563, at 966 [2d ed 1923])

Footnote 42: (Samuel R. Gross, Expert Evidence, 1991 Wis. L. Rev. at 1190) 

Footnote 43: (Article VII Opinions and Expert Testimony - Rule 706: Court Appointed Experts, 12 Touro L. Rev. 535 [Winter 1996]) 

Footnote 44: (id.) at Ftn. 34

Footnote 45: This authority was incorporated in the Uniform Rules of the Trial Courts (22 NYCRR) §202.18, which provides that "the court may appoint a psychiatrist, psychologist, social worker or other appropriate expert to give testimony with respect to custody or visitation." 

Footnote 46: What little case law there is involving ex parte communications with expert witnesses centers around contact between judges and a court-appointed expert rather than counsel for the parties and the court's expert (Flynn-Federico v Federico, 8 AD3d 65 [2d Dept. 2004]; Lightman v Lightman, 253 AD2d 453 [2d Dept. 1998]). Court-appointed, independent neutral experts were also seen as a way of bringing to an end to the practice where judges would investigate the cases themselves (Herb v Herb, 8 AD2d 419 [4th Dept. 1959]), have ex parte communications with the witnesses (Kessler v Cotter, 285 AD 206 [4th Dept. 1955]), and rely upon expert's reports that were kept confidential (Fields v Kaufman, 9 AD2d 375 [1st Dept. 1959]). Of course, with the expansion of the judicial gate-keeping function from the decisions in Daubert v Merrell Dow Pharmaceuticals, Inc. (509 US 579 [1993]) and Kumho Tire Co. v Carmichael (526 US 137 [1999]), certain commentators are of the opinion that "this seems a particularly apt moment in legal history to consider whether modern standards of judicial ethics should be adjusted to permit judges to engage in sua sponte, ex parte research while a case is pending or impending and, if so, how they may go about it without forsaking fundamental due process rights" (George D. Marlow, From Black Robes to White Lab Coats: the Ethical Implications of a Judge's Sua Sponte, Ex Parte Acquisition of Social and Other Scientific Evidence During the Decision-making Process, 72 St. John's L. Rev. 291 [Spring 1998]).

Footnote 47: In endorsing the use of court-appointed valuation experts in matrimonial litigation, the Appellate Division adopted the tenets of a sister court in New Jersey that held "the use of a court- appointed expert accomplishes that stated purpose and does so more efficiently than if each party employed their own. On behalf of the court, he garners the assets and objectively evaluates them. He is not considered anyone's 'hired gun' and so disputes regarding his methodology or data base are typically few in number and easily resolved to everyone's satisfaction...In fact, his unique position has been shown to be significant in prompting settlement" (Zirinsky v Zirinsky, 138 AD2d 43 [1st Dept. 1988]). This holding highlights the changing nature of the relationship of science to the law. Given the current controversy over the role of mental health evaluations in custody cases, the methodology used and the scientific basis for the clinical conclusions drawn, this view may not be as universally held in 2005 as it was in 1988.

Footnote 48: American Law Institute-American Bar Association Continuing Legal Education, American Bar Association Civil Trial Practice Standards (February 1998) SJ048 ALI-ABA 473, 478 (December 2003).

Footnote 49: (id.) at 510

Footnote 50: (id.) at 513-514

Footnote 51: (id.) at 478

Footnote 52: Reply Affirmation of Respondent's counsel., dated December 16, 2005 at ¶8.

Footnote 53: ORDERED that the Law Guardian shall serve a copy of the signed forensics order on all counsel within 10 days after the Order is signed. Service may be made pursuant to CPLR 2103(b) either in person, by fax or overnight mail. The Law Guardian is to file proof of service with the Court on the next adjourned date; and it is further
ORDERED that within 10 days of being served with a copy of this Order as provided herein, the attorneys for the parties and the Law Guardian may submit to the forensic evaluator copies of any other documenta-tion deemed relevant to the assessment. Any documentation and correspondence submitted to the foren-sic evaluator by the attorneys or the Law Guardian must be served on all counsel either in person, by fax or by overnight mail prior to or at the same time as delivery to the forensic evaluator; and it is further
ORDERED that thereafter all counsel shall have no contact with the forensic evaluator except as provided in Article 31 of the CPLR or as directed by the Court by further Order issued pursuant to a written motion served upon all counsel; and it is further
ORDERED that except to schedule appointments and attend interviews with the forensic evaluator, neither the parties nor their attorneys shall have any contact with the forensic evaluator nor shall they provide any materials to the forensic evaluator that were not given to them by the evaluator to complete and return; and it is further
ORDERED that any contact between the forensic evaluator and counsel concerning the scheduling of necessary appointments, production of the children for interviews, or arrangements for payment of the evaluator's fees must be in written form (e.g. letter, e-mail, fax) and copies are to be sent to all counsel.

Footnote 54: (Samuel R. Gross & Kent D. Syverud, Getting To No: A Study of Settlement Negotiations and the Selection of Cases for Trial, 90 Mich. L. Rev. 319 [1991]; and Samuel R. Gross, Expert Evidence, 1991 Wisc. L. Rev. at 1119-20)

Footnote 55: (Steven Lubet, Expert Witnesses: Ethics and Professionalism, 12 Geo. J. Legal Ethics 465, 466 [Spring 1999]) 

Footnote 56: (id.) at 466-467

Footnote 57: (James S. Degraw, Rule 53, Inherent Powers, and Institutional Reform: the Lack of Limits on Special Masters, 66 N.Y.U. L. Rev. 800, 816 [June 1991])

Footnote 58: Affirmation of the Law Guardian, dated December 14, 2005 at ¶10.

Footnote 59: Affirmation of the Law Guardian, dated December 14, 2005 at ¶¶11 and 12.

Footnote 60: Ochs v Ochs, 193 Misc 2d 502 [Sup Ct Westchester County 2002]

Footnote 61: In Lehman v Lehman (70 NY2d 674 [1987]), a child custody and visitation case, the Court of Appeals affirmed a trial court's decision to lower the compensation for a psychiatrist from $11,650 to $5000. This unusual action was taken by the court because the expert "abandoned his role as a neutral scientific arm of the court and became the dedicated partisan of the mother." The Appellate Division also affirmed the trial court's decision stating that when a court-appointed expert has "abandoned his role as a neutral scientific arm of the court ... he forfeits all entitlement to a fee."